UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**MICHAEL ANDREW LONG**,

Debtor.

Case No. **07-60011-7**

**MOUNTAIN WEST BANK, N.A.**,

Plaintiff.

-vs-

**MICHAEL ANDREW LONG**,

Defendant.

Adv No. **07-00026**

# MEMORANDUM OF DECISION

At Butte in said District this 17th day of June, 2008.

In this adversary proceeding the Plaintiff Mountain West Bank, N.A. ("MWB") seeks exception from the Defendant/Debtor Michael Andrew Long's ("Long") discharge of its claim for a defaulted loan under 11 U.S.C. §§ 523(a)(4) and 523(a)(6), and objects to Long's discharge under 11 U.S.C. §§ 727(a)(3) and 727(a)(4)(A). Long opposes exception from or denial of his discharge, and counterclaims for his attorney fees and costs based on provisions of the loan agreements. Trial of this adversary proceeding was held at Missoula on January 28, 2008, and

1

the parties have filed briefs which have been reviewed by the Court together with the record and applicable law.  For the reasons set forth below judgment will be entered dismissing MWB's claims for relief against Long, and dismissing Long's counterclaim for attorney's fees and costs.

MWB was represented at trial by attorneys Jonathan Motl ("Motl") and Amy Randall ("Randall") both of Helena, Montana.  Long appeared and testified represented by attorney James H. Cossitt ("Cossitt") of Kalispell, Montana.  MWB's president and director Richard E. Hart ("Hart") testified, as did the Trustee Richard J. Samson ("Samson").  Both sides offered exhibits ("Ex."), most of which were admitted without objection.[1]  At the conclusion of the Plaintiff's case-in-chief Long moved for a directed verdict or for judgment dismissing MWB's objection to discharge based on § 727(a)(3) for failure to maintain records.  The Court heard argument from counsel, then took Long's motion for a directed verdict under advisement.  At the conclusion of Long's case-in-chief MWB moved for an immediate dismissal of Long's counterclaim for attorney's fees, which the Court denied.

The agreed Pretrial Order submitted by the parties on January 23, 2008, was approved by the Court and supercedes the pleadings.  The Pretrial Order provides that this Court has jurisdiction of this cause under 28 U.S.C. § 1334 and 28 U.S.C. § 157.  MWB's claims for relief are core proceedings to determine dischargeability of a particular debt and objections to discharge under § 157(b)(2)(I) and (J).  This Memorandum of Decision contains the Court's

---

[1]MWB's Ex. 11B was withdrawn.  Long's Ex. KK was refused admission.  MWB's Ex. Plaintiff's Ex. 1A, 1B, 1C, 2A, 2B, 2C, 3, 4, 5, 6, 7A, 7B, 7C, 7D, 7E, 7F, 7G, 7H, 7I, 7J, 8A, 8B, 8C, 8D, 8E, 8F, 8G, 8H, 9A, 9B, 9C, 9D, 10A, 10B, 11A, 12A, 12B, 12C, 12D, 13, and Long's Ex. A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, HH, JJ, MM, MM1, MM2, MM3, MM4, MM5, MM6, MM7, NN, OO, and PP, all were admitted without objection.

findings of fact and conclusions of law.

## FINDINGS OF FACT

The parties agreed to the following facts in the approved Pretrial Order (Docket No. 49):

1. Long was the owner and manager of AboutMontana.net, Inc., ("AboutMontana"), a Montana for-profit corporation. AboutMontana operated as an internet service provider ("ISP") in the Kalispell, Montana, area.

2. On November 29, 2004, AboutMontana borrowed $100,000 from MWB. The MWB loan number was 660000139 ("Loan").

3. As part of the Loan AboutMontana signed a security agreement giving MWB a security interest in all assets of AboutMontana, including inventory, accounts, equipment and general intangibles. Long also signed a personal guarantee of the Loan.

4. MWB has acted to default and collect on the Loan. Long now owes on the Loan through his personal guarantee of the Loan.

5. Long has listed his obligation on the Loan as a debt he seeks to discharge in bankruptcy.

6. On June 2, 2005, AboutMontana sold some of its assets for the amount of $141,733.10. The AboutMontana assets sold were pledged as security for the Loan. The AboutMontana sale documents were signed by Long.

7. The amounts of money AboutMontana received from the June 2, 2005, sale of assets were deposited into an AboutMontana checking account maintained at MWB. The deposits were made through a deposit of $30,000 made on June 24, 2005, and a deposit of $111,733.10 made

3

on July 1, 2005.

8.  The ending monthly balances in the AboutMontana MWB checking account were

$91,393.18 (July, 2005), $78,216.84 (August, 2005), $64,556.79 (September, 2005), $51,542.79

(October, 2005), and $3,11.54[2] (November, 2005).

9.  In November of 2005 the AboutMontana MWB checking account was effectively

depleted by a $30,000 transfer from the AboutMontana MWB checking account into a new

checking account Long had established in his own name at a Wells Fargo bank in Kalispell.

10.  AboutMontana ceased making payments on the Loan in February of 2006 causing the

loan to be defaulted.

Additional and supplemental facts were established from the testimony and exhibits

admitted at trial.

AboutMontana was incorporated in early 2000.  Long became the controlling shareholder

in 2003 when he bought out a partner.  AboutMontana was in the internet dial-up and wireless

business until it sold its assets in June of 2005.  Prior to the sale, Long testified, AboutMontana

was in the business of selling website design, database formats, and marketing.

Ex. 3 is an "Agreement and Release" between Long and his common law wife Leann S.

Devine ("Devine"), who was an employee of AboutMontana, terminating their common law

marriage and dividing assets, dated October 8, 2003.  Long testified that Ex. 3 addressed both his

and Devine's business ties as well as their personal obligations.

Ex. 3 required Long to continue making lease payments on Devine's Honda vehicle used

---

[2]The Pretrial Order states this last amount as "$3,11.54" [sic] on page 3.  Ex. 7H shows
the ending balance on November 30, 2005, as $3,111.54.

for AboutMontana business purposes in the amount of $506.25, and to guarantee Devine's

employment and pay Devine's salary until November, 1, 2005.  Paragraph 4 of Ex. 3 required

Long to pay Devine a consulting fee each month for three years in addition to her salary.  Long

testified that Devine wanted the business in addition to personal assets and their house, and that

he has paid off his obligation to Devine owed under Ex. 3.

**The MWB Loan.**

Hart testified that MWB usually requires current financial information as part of its loan

process, including a financial statement and the past few years of tax returns.  Long submitted a

personal financial statement, Ex. 1B, and an AboutMontana business plan, Ex. 1C, to MWB in

support of AboutMontana's loan application.  The Executive Summary, Part 1.0 of Ex. 1C,

describes AboutMontana's business plan to expand beyond its dial-up internet service to provide

free high speed broadband internet service to residences in the Whitefish community, and

eventually franchise its sales and marketing model.  Ex. 11, p. 3, l. 28.  Part 2.2 of Ex. 1C

summarizes AboutMontana's assets, liabilities and capital.

Hart testified that AboutMontana's business plan provides that an equipment note held by

First Interstate Bank ("FIB") would be satisfied by the loan being sought by AboutMontana from

MWB.  Ex. 1C, Part 8.0.  Under cross examination Hart admitted that a prior perfected lien on

collateral would have priority over subsequent liens, which can be determined by a UCC lien

search with the Montana Secretary of State.  He testified that if MWB had performed a lien

search at the time of the Loan it would have done more due diligence, and would have requested

more collateral for the Loan because of FIB's prior lien.

Ex. 2A is the promissory note for $100,000 naming AboutMontana as borrower.  The

5

default provisions of Ex. 2A include as an "Event of Default," in addition to failure to make payments when due under the note, "[a] material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired." Another catchall provision under Default states: "Other Defaults. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower." Ex. 2A provides for a right of setoff against the Borrower's accounts at MWB, and authorizes MWB "to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights . . . ."

Ex. 2B is the commercial security agreement whereby AboutMontana pledged all its inventory, chattel paper, accounts, equipment and general intangibles to secure the Loan. Ex. 2B provides that "Collateral" includes all proceeds from the sale of any collateral. Hart testified that the major assets securing the Loan were AboutMontana's accounts. Long confirmed that he understood that MWB had a security interest in all of AboutMontana's assets. Hart testified that MWB would not have made the Loan to AboutMontana as an unsecured loan because it was a term loan of 15 years with a 5 year balloon, and MWB would not make an unsecured loan with such a term.

Hart testified that Ex. 2B required the proceeds from any disposition of MWB's security to go first to MWB and then to FIB, and that Long was not entitled to spend proceeds from the sale of collateral. On page 2 Ex. 2B provides:

6

Transactions involving Collateral.  Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral.  While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business.  A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale.  Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.  This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust[3] for Lender and shall not be commingled with any other funds; provided, however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

Ex. 2B requires AboutMontana to provide notice to MWB under eight circumstances[4] on page 1, under several of which, Hart testified, notice of the proposed sale of AboutMontana's assets was required.  First, he testified that notice was required because the sale possibly constituted a change in AboutMontana's management or in its assumed business name and because AboutMontana changed its website.  Second, Hart testified that AboutMontana's business practice changed, although he admitted on follow up that change was not among the enumerated circumstances requiring notice.

_____

[3]The Final Pretrial Order does not set forth a claim for exception from discharge under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity.  MWB's contentions under § 523(a)(4) are limited to larceny and embezzlement.

[4]"(1) [C]hange in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender."

7

On page 2 of Ex. 2B are provisions governing transactions involving collateral, including removal of and title to collateral.  Page 3 has provisions requiring notice of encumbrances.  Hart testified that AboutMontana's sale of MWB's collateral put the Loan into default under Ex. 2A and 2B, and entitled MWB to setoff the debt against any funds on deposit in AboutMontana's accounts at MWB, including any sale proceeds.  "Miscellaneous Provisions" on page 5 of Ex. 2B include:

> Amendments.  This agreement, together with any Related Documents[5], constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Ex. 2C is Long's personal guaranty of the Loan dated November 29, 2004.  Hart testified that MWB would not have made the Loan to AboutMontana without Long's guaranty.  Ex. 2C includes under "Miscellaneous Provisions" a provision almost identical with the "Amendments" provision from Ex. 2B quoted above, and in addition includes a provision for attorney's fees and costs on page 2 :

> Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with this Guaranty.  Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

In addition to the Loan from MWB, Long testified that AboutMontana also owed FIB

---

[5]"Related Documents" includes the promissory note and Long's personal guaranty.  Ex. 2B, page 6, "Definitions."

under the terms of a promissory note which predated its loan from MWB, and that FIB had a security interest in AboutMontana's assets.  Later, under questioning by the Court, Long testified that AboutMontana had multiple accounts with FIB.

 MWB filed UCC financing statements to perfect its security interest in its collateral, Ex. V and X, which were acknowledged by the Montana Secretary of State on December 1, 2004, and December 2, 2004, Ex. U and W, respectively.  Hart testified that MWB conducted a lien search of AboutMontana, but not until March of 2005.  Ex. T is the result of that lien search with the Montana Secretary of State Business Bureau Services, and shows the first lien position against AboutMontana held by FIB, second lien position held by MWB and Santa Barbara Bank & Trust Leasing in third position[6].

Long testified that after the Loan from MWB was funded he continued to work through AboutMontana to develop its business model described in Ex. 1C, and made regular payments on the Loan.  Hart testified that MWB has approximately 3,000 checking accounts, and that its loan officers do not monitor each account on a day-to-day basis.

Long testified that AboutMontana's customers included MWB employees and officers, and that some of his MWB customers paid for AboutMontana's ISP services but that certain MWB officers requested free internet services, which Long gave them.  Hart denied having an account with AboutMontana, and testified that only one MWB officer had an account and it was discontinued.

---

[6]Long testified that Santa Barbara Trust might have a lien on AboutMontana's antennas but he was not sure.  At his 11 U.S.C. § 341 meeting of creditors Long was asked by MWB's counsel whether Santa Barbara Bank and Trust had a security interest in AboutMontana's assets and answered:  "Not that I know of ...."  Ex. 11, p. 9.

Long testified that AboutMontana was forced out of the ISP business when its own internet access provider, Century Tel, changed the terms of its provision of internet access to AboutMontana.  In late 2004 and early 2005, the conversion of dial-up internet service to DSL was taking place in Flathead County.  Long testified that AboutMontana was paying all its money to Century Tel, and Long decided to bypass offering DSL services and offer wireless internet service to AboutMontana's customers.  However, he testified that Century Tel and one other entity in the Flathead Valley, identified as YDI, controlled all access to wireless services. AboutMontana was acquiring antennas to obtain wireless capability of its own, and it paid YDI approximately $75,000 for delivery of wireless antennas.  But Long testified that when Century Tel and YDI learned of his plan to give away wireless internet access free, they refused to deal further with AboutMontana.  He testified that Century Tel demanded $43,000 in immediate payment and increased his monthly internet access fee to $12,000 per month on or about May 2005.  He testified that AboutMontana was not able to start its wireless business, and that he approached Fred Weber of Montana Sky and offered to sell AboutMontana's ISP assets.

**The "Asset Sale."**

Ex. 4 is the buy/sell agreement between AboutMontana and Montana Sky dated June 2, 2005, for the sale of 1675 AboutMontana customer accounts[7], racks, servers, routers, modems, software and other physical assets used for networking.  The only assets not sold pursuant to Ex. 4, according to Long, were wireless antennas and fifty percent of AboutMontana's personal computers.  Ex. 11, p. 8.  Long testified that he also agreed to take the Devine obligation as part

---

[7]Long testified at the § 341 meeting that the value in AboutMontana was the customer list.  Ex. 11, p. 7.

of the sale of accounts.  Montana Sky did not assume any of AboutMontana's obligations.  Ex.

11, p. 5.  Long testified that AboutMontana's corporate attorney Jack Quatman, who prepared his

agreement with Devine, had nothing to do with preparing Ex. 4.

Long was asked on direct examination by MWB's counsel if he thought he was in default

when he sold AboutMontana's assets securing the Loan and answered that he "assumed the bank

knew."  Hart testified that MWB did not receive notice or knowledge of the sale of About

Montana's assets prior to January or February 2006.  Long testified that no one else was involved

in negotiating the sale to Montana Sky, and that he did not give written notice of the sale.  Hart

testified if MWB had learned of the asset sale it would have contacted its attorney and exercised

its right to setoff the loan against AboutMontana's MWB account in June or July of 2005, when

there were still sufficient proceeds from the sale of its collateral in the account to pay the Loan in

full, and to pay in full the note and prior lien held by FIB which Hart testified had a balance of

approximately $8,000.  Later, however, when asked whether MWB would have objected to the

sale if it had known Hart answered no, but that it would have informed the buyer that it was a

secured creditor.

When asked about his understanding of what was sold, Long testified that he did not sell

the company, but sold a portion of the business including the internet access business.  He

testified that he told his employees that he was selling the company as it related to internet

access.  At his § 341(a) meeting of creditors, Ex. 11, pages 4-5, Long answered "Correct" when

the Trustee stated that the company ceased doing business in June 2005 when it was sold to

Montana Sky.  Shortly thereafter Long explained that the sale was a "stock sale" of a client list,

11

and then "they purchased my customer base." Ex. 11, p. 5[8].  Long testified at trial that when he heard the Trustee ask about a "stock sale" at the creditors' meeting he thought the Trustee meant sale of inventory, and he was confused and did not understand the difference and used the terms "stock sale" and "asset sale" interchangeably at the creditors meeting.  Samson testified that he assumed that the sale was an asset sale.  Samson testified that he conducts many § 341 creditors' meetings, that it is not uncommon that debtors can be nervous and confused by technical terms, and Samson answered in the affirmative when asked whether he thought Long answered the question before he understood the difference between an asset sale and a stock sale.  Ex. 11, p. 5, lines 14-28.

At Long's deposition dated September 19, 2007, Ex. 13, at page 22, Long testified that AboutMontana went through a partial asset sale.  At pages 40-41 Long testified that he did not "say substantially all of the assets" were being sold by AboutMontana when he told its employees, but rather "I informed them the company was going to be sold."  At page 23 Long said that he sat down with AboutMontana's employees and explained that he would be selling the company and they would have new jobs with the new company.  Ex. 13, p. 23.

At trial Long testified that the morning after the sale closed all circuits were switched to Montana Sky's machines and emails were sent to all of AboutMontana's users automatically.  Long testified that Montana Sky did not want AboutMontana's domain name, and he thought it was important to keep AboutMontana's name, so Montana Sky did not purchase AboutMontana's domain name and left it to him.

----

[8]The Trustee explained to Long the difference between a stock sale and an asset sale, i.e., that Montana Sky bought an asset but did not assume any of the obligations.  Long agreed that it was an asset sale of the customer base and some computer equipment.  Ex. 11, pp. 5, 6.

12

Samson testified that he interpreted Long's § 341 testimony to mean AboutMontana ceased doing business. Long testified that AboutMontana continued to do business in July 2005 after the asset sale, but that it did close as an ISP provider. He testified that after the asset sale AboutMontana continued in a travel-related business under 2 different business models, one of which was an electronic magazine and tourist database targeting motorcycle enthusiasts between the ages of 48 and 68 which he called "MC Travel" consisting of a magazine and a website designed to appeal to baby boomer motorcycle enthusiasts.

Long testified that he moved AboutMontana's business address[9] in August or September 2005. He testified that he was supposed to obtain the final funding for his motorcycle magazine and website business in November 2005. He testified that he had solicited investors and obtained oral commitments from two venture capitalists[10] to invest in the motorcycling magazine and website under a new business plan. He attempted from May 2005 until the beginning of 2006 to make the motorcycle magazine business succeed, but he testified that he stopped when the venture capital funding did not materialize[11], and he took a job as a truck driver. At his deposition Long testified that he had not completely abandoned any further use for AboutMontana, and "was still seeking to have some other opportunities come into fruition." Ex.

---

[9]The new address was handwritten onto Check Nos. 3650, 3658 and 3664 to Staples so that it would change its billing address for AboutMontana on its computer system. Ex. 7H.

[10]Long identified the venture capitalists as investment bankers named as Murdock Capital and Joe Spitz.

[11]Long testified that a competitor motorcycle travel magazine came out a month before Long's magazine was to debut, and his investors decided to hold up funding and wait. After 3 months of waiting, he testified, his investors told him they would not fund his magazine business.

13, p. 107.

Earlier in his deposition Long described his other business ventures between June 2005 and December 2005 as "another computer company and a magazine." Ex. 13, p. 11. Long was asked: "And were you thinking of starting another computer company or were you talking to an existing one?" Long answered: "I was considering starting another computer company." Ex. 13, p. 11. Long disagreed with MWB's question that AboutMontana had no income during July 2005, answering that there was some small income that month.

Long testified that the sale proceeds were received by AboutMontana and deposited into AboutMontana's MWB corporate checking account. Ex. 5 are copies of the checks to AboutMontana from the asset sale dated 6-23-05 in the amount of $30,000.00, and 6-30-05 in the amount of $111,733.10 which Ex. C shows was deposited into AboutMontana's corporate account at MWB. Long testified that he continued to pay business debts out of AboutMontana's MWB account even while he was doing business out of his house. He testified that checks he wrote would be on his computer's zip drive, that any check written as a business expense could be in the company's QuickBooks program, and that he has business ledgers for AboutMontana and other documents related to his continuation of business, but he did not bring any to trial.

Long testified that the decisions how to spend the sale proceeds were his alone. When asked why the sale proceeds were not applied in a lump sum to the Loan from MWB, Long testified that he continued to make payments on the Loan, some personally and some on behalf of AboutMontana, for several months while he tried to continue in business. Hart testified that when the proceeds were deposited into AboutMontana's MWB account it had a possessory lien on the funds. Hart testified that he believes Long converted the proceeds to his own use because

14

he removed the funds from AboutMontana's corporate account and deposited them in his own accounts to control.

Hart testified that MWB holds loan default meetings weekly, and that AboutMontana's Loan appeared on MWB's past due report in approximately January or February of 2006. Hart examined AboutMontana's account history for the end of February 2006 until May. He testified that there was not much left in the account, and he noted small, infrequent deposits unlike AboutMontana's kind of business. Hart noted lots of activity in AboutMontana's MWB account through the Summer of 2005, including the checks to AboutMontana reflected on Ex. 5, and in addition noticed credit card debt paid by Long. Hart testified that his investigation did not recover any updated financial information from AboutMontana, and he did not know if MWB sought updated financial information from AboutMontana in late 2005.

Hart performed a UCC search, and MWB called FIB regarding its lien. He also investigated the sale of assets. Hart testified that his work involves troubled loans and workouts[12], but that he never saw anything like the instant case where the borrower sold security and exhausted the proceeds without the lender's knowledge. Hart estimated that Long converted close to $60,000 to his own use.

**AboutMontana's/Long's Bank & Credit Card Records.**

Long testified that he was the only person with check signing authority on the AboutMontana MWB account, that all decisions to spend the money in the account were made solely by him without anyone else involved, and that he signed all checks. He testified that he understood that MWB had a security interest in AboutMontana's assets at the time he wrote

---

[12]Hart testified that normally commercial loans are paid in full.

checks on About Montana's MWB account.

Ex. 7 is a series of monthly bank statements for AboutMontana's MWB account, No. 610000330, for the period from April 2005 through January 2006. Long testified that the statements reflect AboutMontana's income from ISP services, marketing, creating web sites and programing, as well as its expenses. He testified that he used AboutMontana's business checking account to make payments on his mortgage for his house, and for utilities of which part were for his personal residence.

MWB's counsel examined Long at length about individual deposits and expenditures on Ex. 7[13]. For example MWB asked Long about a deposit in the sum of $858.50 dated 5/3/2005 on page 1 of Ex. 7B. He testified that it was a payment to AboutMontana for consulting fees, or for other services other than dial up which he explained depended on the client.

Ex. 7A is the April 2005 bank statement for AboutMontana's MWB account. Check No. 3377 dated 4/15/05 is made out to Long in the amount of $2,439.65, which Long testified was a payroll check to Long before the asset sale. Check Nos. 3350 and 3352 were checks written by Long to Devine in the amounts of $506.05 for a Honda lease, and $920.95 for her wages, on April 1, 2005[14]. Long testified that his agreement with Devine, Ex. 3, required such payments to Devine.

Ex. 7B is the May 2005 bank statement of AboutMontana's MWB account. Check 3395

_____

[13]Long was examined extensively regarding dozens of checks listed in Ex. 7, most of which were related to ordinary corporate business expenses and are not included in this Memorandum unless they bear directly on the issues pending under § 523.

[14]A third check, No. 3351 also dated 4/1/05, is made out to Devine in the amount of $324.95.

dated 5/1/05 is a payroll check made out to Long in the amount of $2,342.72.

Ex. 7C is the June 2005 bank statement, and shows 29 deposits and other additions totaling $64,066.85. Check Nos. 3481, 3482 and 3483 are checks each in the amount of $225.00, with notations indicating they are for dividends dated 6/15/05. Check No. 3460 is made out to FIB in the amount of $203.94, which Long testified was payment on the FIB note. Check No. 3458 dated 6/1/05 made out to Northwestern Energy in the amount of $120.93 has two account numbers listed on the memo line, and Long testified that he had both a personal and corporate account with Northwestern Energy.

Check No. 3455, dated 6/1/05, is made out to American Express in the amount of $500.00, with Long's name on the memo line with the number "91004." Long testified that he used his personal American Express account for both personal and AboutMontana's corporate business use, which he estimated in the proportion of 15 percent (15%) personal and 85% business. Check No. 3475, dated 6/9/05, is made out to MBNA America in the amount of $1,000.00, with Long's name and "0771" on the memo line. He testified that he used that MBNA credit card 70% for corporation business and 30% for his personal matters. Check No. 3484, dated 6/15/05, is made out to Discover Card in the amount of $300.00, with Long's name and "5874" on the memo line. Long testified that he used his Discover card for a combination of corporation business and personal matters, but could not estimate the ratio.

Check No. 3504 dated 6/28/08 is made out to Long in the amount of $3,000.00. He testified that 3504 was a withdrawal of corporate funds to pay bills. Check Nos. 3490, 3491, 3502 and 3503 dated 6/24/05 and 6/27/05 are all made out to FIB, and Long testified they are payments on AboutMontana's note to FIB.

17

Ex. 7D is the AboutMontana MWB statement for July 2005, and shows 5 deposits and other additions totaling $113,154.20, including a deposit dated 7/1/2005 in the amount of $111,733.10. Check No. 3507 on Ex. 7D in the amount of $1,132.38 to Michael Atta was described by Long as a check to an employee. Long testified that AboutMontana was still paying employees in July 2005.

Check No. 3489 dated 6/24/05 is made out to the law firm of Quatman & Quatman in the amount of $205.00. Long testified that Jack Quatman did contract work and was AboutMontana's corporate attorney. Check Nos. 3497 and 3499 dated 6/27/05, both in the amount of $1,000.00, were made out to Chase MasterCard and American Express, respectively, with Long's name on the memo line. He testified that both checks were for business expenses charged to his personal credit cards. Check No. 3515 is a check made out to Devine in the amount of $16,233.10 with a memo "Settlement agreement payoff," dated July 5, 2005, which Long testified was a business expense of AboutMontana.

Check No. 3523 dated 7/9/05 is made out to Long in the amount of $2,500.00. Check No. 3543 dated 7/15/05 is made out to Long in the amount of $3,000.00. Check No. 3519 dated 7/9/05 is made out to Northwestern Energy in the amount of $105.68. Long testified that a portion of 3519 may be for his personal use because two account numbers are listed on the memo line. Check No. 3518 dated 7/9/05 is made out to MBNA America in the amount of $1,000.00, with Long's name on the memo line. He testified that 3518 was written to pay a business debt he paid with his MBNA credit card. Check No. 3523 is a check made out to Long in the amount of $2,500.00 dated 7/9/05.

Check No. 3538 dated 7/20/05 is made out to Chase MasterCard in the amount of

18

$500.00, with Long's name on the memo line.  He testified that he used his personal Chase MasterCard for corporate business expenses more than 95 percent of the time.  Check No. 3543 is a check made out to Long in the amount of $3,000.00 dated 7/25/05.  Check No. 3548 is a check to MWB from Long in the amount of $956.02 dated 7/28/05.

Ex. 7E is the AboutMontana MWB bank statement for August 2005, showing a single deposit in the amount of $12.00.  Long testified that AboutMontana did no consulting for the month of August 2005, and that the $91,393.18 beginning balance carried over from the previous month came from the sale of AboutMontana assets.  Ex. 7E shows 36 checks written on the AboutMontana MWB account during August, including 32 checks which were written on deposits from the sale of AboutMontana's assets.

Check No. 3558 dated 7/28/05 in the amount of $800.00 is made out to American Express with Long's name on the memo line.  He testified that he used his American Express for AboutMontana business a majority of the time.  Check No. 3559 dated 7/28/95 in the amount of $300.00 is made out to Home Depot with Long's name on the memo line.  He testified that he used No. 3559 to pay a personal obligation with a corporate check.  Check No. 3561 is a check made out to Long in the amount of $1,000.00 dated 7/30/05.  Check No. 3571 is a check made out to Long in the amount of $1,000.00 dated 8/15/05.

Ex. 7F is the AboutMontana MWB bank statement for September 2005.  Check No. 3592 dated 8/30/05 is a loan payment to MWB.  Check No. 3595 dated 9/1/05 is a check made out to Long in the amount of $3,000.00, which he described as a personal expense.  Check No. 3585 dated 8/30/05 in the amount of $800.00 is made out to American Express, with Long's name on the memo line.  Check No. 3615 dated 9/23/05 in the amount of $500.00 is made to Long.  Long

testified that No. 3615 was for him personally, but all other checks on Ex. 7F were for business.

Ex. 7G is the AboutMontana MWB bank statement for October 2005, showing a beginning balance of $64,556.79, which Long testified remained from the sale of AboutMontana's assets, one deposit in the amount of $13.00, and 31 checks and other deductions written on the account totaling $13,027.  Check No. 3635 dated 10/10/05 in the amount of $300.00 is made out to Discover Card with Long's name on the memo line and the number 5874.  He testified that No. 3635 was for mixed business and personal charges, and mostly used for business.  Check No. 3641 dated 10/17/05 is made out to Long in the amount of $3,000.00.  Check No. 3643 dated 10/24/05 is made out to Chase Mastercard in the amount of $500.00 with Long's name written on the notation.  He testified that he paid that personal credit card debt with a corporate check, but that it was used for business.  Check No. 3648 to MWB dated 10/30/05 in the amount of $956.02 is the regular monthly Loan payment.

Ex. 7H is the AboutMontana MWB bank statement for November 2005, showing a beginning balance of $51,542.79, which Long testified remained from the sale of AboutMontana's assets, one deposit in the amount of $13.00, and 33 checks and other deductions totaling $48,444.25.  Check No. 3650 dated 10/31/05 in the amount of $447.19 is made out to FIB with the number "4900050760" on the memo line, and Long testified that he thinks 3650 was for a business expense.  Check No. 3649 dated 10/31/05 in the amount of $744.17 is made out to FIB with "4900049911" on the memo line.  Check No. 3650 dated 10/31/05 in the amount of $447.19 is made out to FIB "4900050760" on the memo line.  Check No. 3666 dated 11/14/05 is made out to FIB in the amount of $436.65 with "4900050322" on the memo line.  No. 3667 dated 11/14/05 is made out to FIB in the amount of $203.94 with "4900051281" on the

20

memo line.

Check No. 3652 dated 10/31/05 in the amount of $600.00 is made out to American Express, but with Long's name and account number noted on the memo line.  Check No. 3655 dated 10/31/05 in the amount of $1,528.23 is made out to Countrywide, and Long testified that No. 3655 was for payment of the mortgage on his personal residence.  Check No. 3659 dated 11/1/05 in the amount of $649.87 is made out to U.S. Bank with Long's name on the memo line. He testified that No. 3659 is a mortgage payment and for driving insurance.  Check No. 3668 dated 11/14/05 is made out to Discover Card in the amount of $300.00, with Long's name on the memo line.  He testified that the Discover Card was in his name, but paid for with a corporate check.

Check No. 3665 dated 11/14/05 in the amount of $500.00 is made out to MBNA America with Long's name on the memo line, and he testified that those charges were primarily for business expenses.  Check Nos. 3661 in the amount of $600.00,  3675 in the amount of $2,000.00, 3676 in the amount of $5,000.00, 3684 in the amount of $1,000.00, and 3677 in the amount of $30,000.00, all are made out to Long and he testified those were personal, but that all other charges on Ex. 7H were for business.  At his deposition Long testified that check No. 3677 was not made out to him for personal reasons, but for the reason to pay business and personal bills while he was driving a truck.  Ex. 13, p. 106.

Ex. 7I is the AboutMontana MWB bank statement for December 2005.  Check Nos. 3690 and 3691 are dividend checks dated 12/15/05 in the amounts of $225.  Long testified that no payments on secured loans were made from checks in Ex. I, but corrected himself when asked about Check No. 3686 dated 11/29/05 made out to FIB in the amount of $744.13, which he

21

testified was for a secured claim.

Ex. 7J is the AboutMontana MWB bank statement for January 2006.  Check No. 3693 is a dividend check in the amounts of $225.  Check No. 3695 made out to FIB in the amount of $744.17, dated December 2005[15] and No. 3696 made out to MWB in the amount of $956.02, were for secured claims, and Long testified that he took $1,700 out of his personal account to deposit into AboutMontana's MWB account to cover those checks.[16]

Long testified that he reviewed Ex. 7, and that the aggregate of AboutMontana checks, which he wrote to himself after the asset sale on the MWB corporate account, was approximately $55,000.

Ex. 8A through 8H are bank statements on Long's personal account at MWB, No. 630000042, from May 11, 2005, through January 10, 2006.  Check No. 3238 on Ex. 8C dated 7/15/05, in the amount of $300.00, is made out to Discover Card with the same number, "5874," as on Check No. 3635 written on AboutMontana's MWB checking account from Ex. 7G.  Check No. 3265 on Ex. 8D, dated 8/30/05 is a check made out to FIB in the amount of $447.19.  Long testified that No. 3265 is for the same FIB loan number as the business checks made out to FIB on Ex. 7, and testified that he made a mistake when he wrote No. 3265 to FIB as a personal expense.  Check No. 3361 dated 12/3/05 on Ex. 8G is another instance where Long paid FIB as a personal expense.

Ex. 9 are Long's bank statements for his personal account at Wells Fargo Bank in

---

[15]The date is illegible, but No. 3695 was processed on 1/4/06.  Ex. 7J.

[16]The Court summarized Ex. 7 at trial, finding that in the early period the bank records show payroll paid and withholding payments made, and that in the period from April 2005 through June 2005 there appeared to be ongoing business activity.

Kalispell.  Ex. 9A begins with a $5,000.00 deposit from the AboutMontana MWB checking

account, No. 3676, on 11/28/05, followed the next day by another deposit from the

AboutMontana MWB account, No. 3677, in the amount of $30,000.00.  Long stated that he did

not know how much of the $35,000.00 from the AboutMontana MWB account he spent on

personal matters versus business.  When pressed on cross examination by MWB's counsel Long

admitted that the Wells Fargo account was in his name, but Long insisted that he used his Wells

Fargo account for both his personal use and for business.

Long wrote a personal check to his attorney Cossitt, No. 00093 in the amount of

$1,000.00 dated 12/2/05.  Long testified that the check to Cossitt was for both business and

personal purposes because he had not yet received the funding for his motorcycle magazine.

Long wrote Check No. 3102 dated 12/15/05 in the amount of $1,800.00 to AboutMontana, and

testified that he put that money back into AboutMontana's MWB account.

Ex. 9B is the statement for Long's personal Wells Fargo account for the period December

21, 2005, through January 23, 2006.  Long wrote checks on notes to FIB on the Wells Fargo

account, No. 3103 dated 12/31/05 in the amount of $447.19 and No. 3110 dated 1/13/06 in the

amount of $203.94[17].  Long wrote Check No. 3104 to AboutMontana on 12/31/05 putting back

into AboutMontana the amount of $1,700.00.  Long testified that he deposited a total of $35,000

from the asset sale proceeds into his Wells Fargo account, and that he wrote to himself checks in

the total amount of $20,000 which did not go into his Wells Fargo account.

In all, Long testified on the second day of trial that he paid a total of approximately

---

[17]Long testified that in January 2006 his notes to FIB went into default.

$55,000[18] to himself out of AboutMontana's MWB account in order to pay bills, but that such payments were not payment of his own wages. He testified that he wrote the $30,000 check, dated 11/29/05, to himself on the AboutMontana MWB account and deposited it into his account in order to pay bills, because he was at the time still trying to raise funds. MWB's counsel attempted to impeach Long with his deposition, Ex. 13, p. 106, Lines 13 – 25, where Long stated that the purpose of the $30,000 check was to be able to pay bills while he was driving a truck. Long stated that the bills he referred to were a combination of business and personal bills, but could not say what business bills he had. At trial Long admitted that was his answer but that it was incorrect.

Ex. 10 is a bank statement for an account at U.S. Bank in Long's personal name, No. 1 047 7207 4332.

Ex. 12A through 12D are Long's personal credit card statements with Chase, Discover, MBNA and American Express. Long testified that he charged personal and corporate expenses to registered vendors on his personal credit cards. He explained that he mixed his personal and corporate dealings to the point that it was "hard to distinguish" between the personal and corporate affairs.

When asked why he did not apply the sale proceeds to pay the MWB Loan, Long testified that he continued to make payments on MWB's Loan and the FIB loans for several months because he was trying to continue in business in his motorcycle travel magazine business. Hart challenged that as inappropriate, and accused Long of conversion of MWB's security. Ex. Q,

_____

[18]On cross examination on day two of trial Long admitted that the previous day he estimated the total of corporate checks he wrote to himself was between $55,000 to $57,000.

24

which was admitted without objection, shows the loan history from MWB's computer records and corroborates Long's testimony, showing regular payments in the sum of $956.02 made from 12/28/2004 and the last payment on 1/3/2006.  Long answered "No" when asked whether he intended to injure MWB or engaged in intentional conduct to harm MWB.

Hart testified that MWB put AboutMontana's loan on accrual and downgraded it in April 2006, and that the loan was approved for charge off[19] by MWB's board on May 18, 2006.  Ex. P. Ex. R shows the amount written off as $99,145.11, including $96,182.48 as a principal balance, $2,867.03 as interest due, and $95.60 as charges and fees.  Hart testified that MWB retained a security interest in the assets sold by About Montana to Montana Sky, and when asked who converted MWB's collateral he answered AboutMontana when it sold the collateral.

**Litigation.**

FIB filed a lawsuit against Montana Sky and MWB, which Ex. HH shows was dismissed on April 17, 2007.  Hart testified that MWB negotiated a settlement with FIB whereby MWB purchased FIB's first secured position in the collateral for $2,500, and now owns all security interests in the collateral.

**Other Litigation.**

FIB filed a lawsuit against Montana Sky in the Montana Eleventh Judicial District Court, Flathead County, Cause No. DV-07-161C, and Hart testified that MWB was joined in that lawsuit.  MWB reached a settlement with FIB in which MWB purchased FIB's prior lien in equipment, which Hart estimated on or about April 3, 2007, at approximately $2,500.  Ex. JJ.

---

[19]Hart explained that MWB approved the AboutMontana loan for charge-off because they felt the loan was in sufficient jeopardy that the asset might not be collectible, but it did not mean that MWB would not pursue collection.

Hart signed off on the settlement with FIB, Ex. JJ, and testified that FIB had charged off its loan to AboutMontana and did not expect to receive anything.

MWB filed its own complaint against Montana Sky in the Montana Nineteenth Judicial District Court, Lincoln County, Case No. DV-07-27 on January 29, 2007, Ex. MM, regarding the sale of its collateral. Ex. MM includes at page 7 Part III, "Claim and Delivery," which Hart testified included allegations of conversion of MWB's collateral. MWB reached a settlement with Montana Sky, which Hart was involved in negotiating[20]. Under that settlement MWB received $15,000 from Montana Sky, about eleven percent (11%) of the sale price, which MWB applied against the defaulted AboutMontana loan, and additionally received antennas and other assets Montana Sky purchased in Ex. 4, including four servers, which MWB picked up and transported to MWB's IT department in Helena while MWB tries to sell them[21]. MWB has not found a buyer for the assets, and Hart testified that MWB will likely realize less than $7,000 from their sale.

Hart testified that MWB filed suit against Long and AboutMontana to collect the loan, but was stopped when Long filed his bankruptcy petition. Hart testified that Long took approximately 6 months from the receipt of the $141,733.10 in sale proceeds to exhaust those

---

[20]Hart testified that in the settlement negotiations Montana Sky indicated that it regretted not doing its own UCC lien search, and that it learned that it would only get a quarter of the number of ISP accounts it expected in the asset sale from AboutMontana. Hart explained that MWB had nothing to do with the ISP clients, and MWB did not want to be seen as a "big guy" in litigation against a "little guy" in active business in the Flathead Valley. MWB concluded that a $15,000 settlement to apply against the AboutMontana loan was a better result than litigation it expected would last three years. Hart testified that MWB had no contact with Long regarding its lawsuit against Montana Sky because of the automatic stay.

[21]Hart testified the 4 servers are difficult to sell because there are no buyers for vintage servers. MWB rejected a $2,000 offer for the servers.

funds.  Hart estimated the balance due on the loan at between $85,000 to $90,000 on the first day

of trial, and on the second day of trial stated the total payoff at approximately $95,000, including

$80,500 in principal and $15,000 in interest.

**Long's Bankruptcy**.

Long filed his Chapter 7 petition on January 9, 2007, with his Schedules and Statement of

Financial Affairs ("SOFA").  Ex. 6.  Schedule B, item 13, lists the AboutMontana stock and

corporate assets as of the petition date.  Long testified that he listed the corporate assets at fire

sale value.  The current value of the stock is stated as $0.00.

On Schedule F, page 2, Long listed MWB as a creditor with an unsecured, nonpriority

claim described as "business debt" in the amount of $99,000.00.  The columns headed

"Contingent," "Unliquidated," and "Disputed" are <u>not</u> checked with respect to MWB's claim.

The SOFA lists income from AboutMontana in 2004 and 2005.  At Question 4 the SOFA lists

MWB's state court Case no. DV-06-369B, lists the judgment against the corporation

AboutMontana, and indicates that summary judgment motions against Long for personal liability

are pending.  Ex. 6.

Samson was appointed as Trustee in Long's bankruptcy.  Samson testified that he

reviewed Long's Schedules, sent Long his standard request for documents, and conducted the §

341 meeting of creditors on March 7, 2007.  Samson was not aware of any documents which

were not produced in response to his request[22].  Samson testified that he did not make any notes regarding records in Long's case, and that in his opinion no additional records were needed.

The § 341 meeting transcript was admitted as Ex. 11.  Long testified at trial that he was quite nervous at the § 341 meeting.  At pages 6-7 Long was asked about the proceeds from the sale of AboutMontana's assets.  When asked by the Trustee what the sale price of AboutMontana's assets was Long answered:  "A hundred and thirty-something."  Ex. 11, p. 6.  Long was then asked:  "Was all of the hundred and thirty used to satisfy company debt?" and he answered "Yes."  Ex. 11, p. 7.  At trial Long admitted that that answer was not correct.  He testified that he was nervous at the creditors' meeting and believed that he and AboutMontana were the same.  Samson was asked whether Long's answer was important and answered that he assumed it was, and that if Long had disclosed that he took $55,000 of the sale proceeds from the company's MWB account Samson would have inquired further and requested an accounting, and that Samson would have been concerned if he learned that the secured party received very little of the proceeds[23].  Long changed his answer at the § 341 meeting about whether he had an accounting where the sale proceeds went.  Ex. 11, p. 10, lines 9-25[24].

---

[22]Long testified that he did not recall whether the Trustee requested documents at the § 341 meeting.

[23]Samson was asked about relative priority of multiple liens on property, and stated the general rule, "[f]irst in time is first in right."

[24]At first Long stated that he had some accounting of where the $130,000 went, but after warning from his counsel Long changed his answer and stated he was not sure if he had any records where the money went.  At trial Long testified that he had not received any written request from MWB to produce documents prior to the § 341 meeting, and that he produced his MWB bank statements at trial, along with loan documents, corporate resolutions and promissory notes.

The Trustee filed a no-asset report in Long's Chapter 7 case on April 6, 2007, and Samson testified that he has not changed his opinion.  No claims bar date was set and no claims were filed.  MWB filed a motion to modify stay, to which the Trustee filed a consent.  Debtor filed a response and a hearing was scheduled.  MWB filed a motion to dismiss its motion to modify stay on June 6, 2007.

MWB initiated the instant adversary proceeding on April 9, 2007, seeking exception from and denial of Long's discharge.  The prayer of MWB's complaint does not include a request for attorney's fees and costs.  MWB served discovery and requested documents from Long on September 12, 2007, which Long testified was the first written request for documents he received.  In response Long produced his MWB bank statements which were admitted into evidence, loan documents, corporate resolutions and promissory notes, search certificates, and a release from Devine, all of which were the same available during his meeting of creditors.  Long testified that he offered to make copies of his records and checks for MWB but it responded that it did not need them.

A pretrial scheduling Order was entered on October 14, 2007, which set deadlines for completing discovery on December 19, 2007, and set December 26, 2007, for filing any pretrial motions.

On November 25, 2007, Cossitt sent MWB's attorneys Ex. NN, an email accompanied by documents produced by Long, including insurance documents, Long's US Bank and Wells Fargo bank statements, and his Verizon Wireless invoices.  Ex. OO is another email from Cossitt to MWB's attorneys dated January 3, 2008, with additional documents including Long's Wells Fargo bank statements.  On cross examination Long was asked whether he included checks and

29

deposit slips in Ex. OO, and he answered that the electronic bank statements shows there were none, and that MWB got what it requested.  Long testified that he has never received a subpoena duces tecum from MWB.

Long filed a motion for judgment on the pleadings and a motion to quash third party subpoenas, in response to which MWB filed objections and a motion to continue the discovery deadline.  After a hearing on January 10, 2008, the Court denied Long's motion for judgment and motion to quash, granted MBW's motion to extend third party discovery and ordered third party discovery completed by January 21, 2008.  No other pretrial motion to compel discovery responses from Long was filed by MWB.

On cross examination by Long's counsel Hart was asked what conduct by Long he considered "willful," and Hart responded, first, that Long kept the Loan current and intentionally made the loan payments while he exhausted the sale proceeds.  Second, Hart testified that it was willful conduct for Long to fail to disclose the asset sale, and for Long to spend the sale proceeds without notifying MWB of the default, or in other words spending sale proceeds that belonged to MWB, and that Long spent MWB's funds without its consent or knowledge and without just cause or excuse.  Hart testified that he believed that Long appointed himself as trustee.[25]  Hart testified that MWB was damaged by the sale because there was no longer any business, cash flow, assets or proceeds available to repay MWB's loan.

Next Hart was asked to identify each instance of maliciousness in which Hart believed

---

[25]Hart testified that in his opinion nothing exists in the loan documents regarding appointment of a trustee, and that Long did not name himself as trustee, but he argued that Long acted as his own trustee in taking the proceeds.  The security agreement, Ex. 2A, at page 2 under "Transactions Involving Collateral," provides that all proceeds "shall be held in trust for Lender."

Long engaged.  Hart answered that Long knowingly spent money belonging to MWB for no

business purpose.  Hart admitted that he is not aware of any conduct by Long designed to harm

the value of MWB's collateral, but argued that MWB's security was sold, converted and spent

for Long's personal purposes.

Long testified that he hired Cossitt to defend him in this adversary proceeding, at a fee of

$200 per hour, and that Cossitt sent him regular billing statements.  Long testified that the last

statement from Cossitt he received showed aggregate legal fees incurred in the sum of $14,000,

and he estimated at trial that Cossitt's fee was up to $17,000.

### DISCUSSION

MWB seeks exception of its claim from Long's discharge under §§ 523(a)(4) and

523(a)(6), and seeks denial of his discharge under §§ 727(a)(3) and 727(a)(4)(A).  Long responds

that MWB has failed to satisfy its burden of proof under both statutes, which are strictly

construed against the creditor and in favor of discharge and a debtor's fresh start.

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but

unfortunate debtor."  *Marrama v. Citizens Bank of Mass.*, __ U.S. __, 127 S.Ct. 1105, 1107, 166

L.Ed.2d 956 (2007).  The "fresh start" is explained by the Ninth Circuit Bankruptcy Appellate

Panel in *Albarran v. New Forms, Inc. (In re Albarran)*, 347 B.R. 369, 379 (9th Cir. BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to
> discharge debts and to make a fresh start free from the burden of past
> indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d
> 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but
> honest, there is a presumption that all debts are dischargeable unless a party who
> contends otherwise proves, with competent evidence, an exception to discharge.
> *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767
> (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p.
> 870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)." *Grogan*, 498 U.S. at 286, 111 S.Ct. at 659. The party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence. *Grogan*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212 Fed.Appx. 589 (9th Cir. 2006). When applying the preponderance of the evidence standard, "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action." *Albarran*, 347 B.R. at 379, quoting *Carrilo v. Su (In re Su)*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002).

The Court notes as significant that the Trustee in Long's Chapter 7 case, Samson, although he appeared and testified, did not join in or express support for MWB's claims for denial of Defendant's discharge. Instead, Samson described the case as a non-asset case for which no additional records were needed, and though he noted that Long was confused at the § 341 meeting about terminology and appeared nervous, Samson had not changed his opinion and agreed that debtors can be nervous and confused about technical terms. Samson did not file an adversary proceeding objecting to Long's discharge, and instead filed a no-asset report asking

32

that the report be approved and that he be discharged as trustee.  *See Olympic Coast Investment, Inc. v. Wright*, 364 B.R. 51, 79-80 (Bankr. D. Mont. 2007), *aff'd.*, 2008 WL 160828 (D. Mont.) (Trustee Samson absent as a party seeking denial of discharge).

**I. § 523(a)(4) – Larceny/Embezzlement.**

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting is a fiduciary capacity, embezzlement, or larceny."  Only embezzlement and larceny are at issue in this adversary proceeding under this subsection.

**A.  Contentions of the Parties.**

MWB contends that Long committed larceny by taking corporate funds, which were property pledged as security for MWB's Loan and other secured creditors, for his personal use or benefit, including $57,700 in corporate checks written to himself.  MWB argues that the sale of the assets was a default under the Loan documents, that the sale proceeds were subject to MWB's setoff rights, and that Long's taking of those funds for his personal use was larceny.  MWB argues that Long kept and took the sale proceeds by failing to inform MWB of the sale of its collateral in time for it to exercise its right to administratively freeze the account with the sale proceeds and set them off against the Loan balance, and that MWB learned of the sale from other sources after the proceeds were exhausted.  MWB cites *U-Save Auto Rental of America v. Mickens (In re Mickens)*, 312 B.R. 666, 681 (Bankr. N.D. Cal. 2004), as having similar facts constituting nondischargeable larceny.

MWB also contends that Long committed nondischargeable embezzlement of the sale proceeds when he used, as a corporate officer, corporate funds for personal use and to pay

unsecured corporate debt.  Since Long intentionally sold corporate assets while knowing he was required to turn them or their proceeds over to MWB, it argues that these show circumstances indicating fraud and completes the showing of larceny or embezzlement.  MWB argues that Long's continued regular monthly payments on the loan for 8 months as though the business continued in regular operation shows that he continued to defraud MWB by means of "'business as usual' fraud" until after January 2006, when no sale proceeds remained.

MWB argues that Long's "course of conduct" defense that he used the sale proceeds in a failed attempt to continue the AboutMontana business must be rejected as unsupported by evidence, not included in his § 341 testimony and pretrial testimony, and contradicted by a non-compete clause in the asset sale agreement, Ex. 4.  MWB argues that no objective evidence exists of any ongoing business activity by AboutMontana after the June 2005 asset sale, and that no other information explains his actions as anything but fraudulent.

MWB argues that Long's testimony that he used the sale proceeds for business uses is not credible since all of the $57,700.00 from About Montana's account was deposited into Long's personal accounts.  MWB argues that Long "wrongly used" corporate funds, which were Plaintiff's security, to settle a property settlement agreement with his former common law spouse, wrongfully used corporate funds to pay his first and second mortgage on his personal homes, and used the funds to pay credit cards and merchant accounts in his own name in excess of $12,000.

Long argues that he had no fiduciary duty to MWB as required under § 523(a)(4), and that larceny and embezzlement do not apply because the loan proceeds were deposited in MWB and he voluntarily repaid the loan for several months.  Long contends that his sale of collateral to

34

pay MWB with its acquiescence created a course of performance which constitutes a waiver that modified their agreement and prohibits MWB from asserting strict contractual compliance. Long contends that the circumstances of the case and materiality of the permitted breach shows MWB's acquiescence to the course of performance under Montana law, based on MWB's awareness of Long's sale of its collateral and acquiescence in the course of conduct by continuing to collect payments and allowing AboutMontana to continue its conduct until Long no longer had money to pay the note. Thus, Long argues, MWB is prohibited from asserting a default created after accepting a particular course of performance, and MWB waived its right to insist on strict compliance with the contract because it failed to apprise him of its insistence and give him a reasonable time to comply.

### B. Course of Performance.

"Course of performance" is defined at MONT. CODE ANN. ("MCA") § 30-1-205(1) of Montana's Uniform Commercial Code ("UCC") ("General Provisions") as follows:

(1) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

  (a) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
  (b) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

Long's course of performance argument as a defense and as grounds for his counterclaim for attorney fees and costs fails to satisfy the elements of MCA § 30-1-205(1)(b) because Long failed to prove that MWB accepted his performance, i.e., the sale of the collateral and transfer of the proceeds to himself, or acquiesced in it "with knowledge of the nature of the performance and

35

opportunity for objection to it."  No credible evidence exists in the record that MWB had knowledge or notice of the asset sale to Montana Sky, or Long's transfer of the proceeds to himself, or that MWB had an opportunity to object.  Montana Sky did not perform a lien search prior to the asset purchase or contact MWB.  Long's only evidence on this point was his testimony that he "thought" MWB knew about the asset sale, but he offered no proof that he gave MWB notice and an opportunity to object.  His testimony that he "thought" MWB knew is unworthy of probative weight, and falls far short of proving his argument that MWB knew and acquiesced in his course of performance.  Hart testified that MWB did not have notice or knowledge of the proposed sale, or of Long's transfer and use of the proceeds, and did not have an opportunity to object.  Therefore, the Court finds that Long failed to satisfy the elements defining "course of performance" under Montana law.

Further, even if Long had satisfied the elements establishing a course of performance, that would not modify or work a waiver of the written Loan agreements under Montana law.  MCA § 30-1-205(4) provides in pertinent part that a "course of performance . . . is relevant in ascertaining the meaning of the parties' agreement and may supplement or qualify the terms of the agreement."  However, the next subsection, MCA § 30-1-205(5) provides in pertinent part: "[T]he express terms of an agreement and any applicable course of performance . . . must be construed wherever reasonable as consistent with each other.  If such a construction is unreasonable:  (a) *express terms prevail* over course of performance[26] ...."  (Emphasis added).

---

[26]A similar subsection providing that express terms control course of performance is found at MCA § 30-2-208(2), but that section is under Chapter 2 of the UCC, "Sales," and does not apply to the Loan agreements between these parties.  If the instant case did involve sales then the UCC would be given primary consideration, with the law of contracts being used to supplement the UCC provisions.  *Trad Industries, Ltd. v. Brogan* (1991), 246 Mont. 439, 444,

Ex. 2B and 2C, the security agreement and Long's personal guaranty, both include under "Miscellaneous Provisions" a section governing amendments which provides that each, with any related documents, "constitute the entire understanding and agreement of the parties as to the matters set forth" and that "no alteration of or amendment to this [Agreement] shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment."  Long failed to offer any evidence that MWB signed a writing amending the note, security agreement and his personal guaranty.  Under Montana law a "contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise."  MCA § 28-2-1602; *Trad Industries, Ltd. v. Brogan* (1991), 246 Mont. 439, 445, 805 P.2d 54, 58.  Long failed to offer any evidence that MWB executed an oral agreement altering the note, security agreement and guaranty.  Hart's testimony that MWB had no notice or knowledge of the proposed asset sale or Long's disposition of the proceeds in time to object is uncontroverted, except by Long's weak assertion that he "thought" MWB knew, and the written provisions of the Loan agreements limiting amendment to a signed writing would control over an oral agreement if one were shown[27].

Thus, Long failed to establish a "course of performance" as defined under Montana law, and if he had established a course of performance under Montana law, the express terms of the

---

805 P.2d 54, 58; *Norwest Bank Billings v. Murnion* (1984), 210 Mont. 417, 422-23, 684 P.2d 1067, 1070.

[27]If the UCC sections governing "Sales" controlled, the provisions of Ex. 2B and 2C which exclude amendment except by a signed writing would prohibit modification under MCA § 30-2-209(2) which provides: "A signed writing which excludes modification or rescission except by a signed writing cannot be otherwise modified . . . ."  *Tran Indus.,* 246 Mont. at 445-46, 805 P.2d at 58.

security agreement and guaranty would prevail[28].

### C. Larceny.

Larceny "requires a taking of property from the possession of another without his consent and with intent to permanently deprive him of possession." *Burlington Industries, Inc. v. Wilson (In re Wilson)*, 114 B.R. 249, 252 n.10 (Bankr.E.D.Cal.1990), citing *Unites States v. Sellers*, 670 F.2d 853, 854 (9th Cir. 1982); *Wussler v. Silva (In re Silva)*, 1999 WL 33490217, *5 (Bankr. D. Idaho). For § 523(a)(4) purposes, larceny is proven if the debtor has wrongfully and with fraudulent intent taken property from its owner. *Kiss Enterprises v. Mirth (In re Mirth)*, 1999 WL 33490214, *4 (Bankr. D. Idaho). Larceny is distinguished from embezzlement only in that the original taking of the property must be unlawful. *Mickens*, 312 B.R. at 680; 4 COLLIER ON BANKRUPTCY, ¶ 523.10[2] (15th ed. rev.).

In the Pretrial Order at page 5 MWB states that "AboutMontana's taking of the business funds received at the asset sale was lawful," but that Long's taking of the proceeds for his personal use was larceny. Several of Long's actions with respect to the sale of MWB's collateral were in violation of the security agreement, Ex. 2B, including but not limited to AboutMontana's removal and sale of MWB's collateral outside the ordinary course of business, failure to deliver the sale proceeds to MWB, failure to give MWB notice of AboutMontana's conversion to a different type of business entity, and the ultimate default in payments on the note. Indeed, the

---

[28]Another Montana UCC statute under "Sales" (which does not apply to the instant non-sale Loan and security agreement between the parties) provides further explanation: "The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance . . . ." MCA § 30-2-208(2).

default provisions on page 4 of Ex. 2B are broad enough to include commencement of bankruptcy proceedings, and even if MWB "believes the prospect of payment or performance . . . is impaired" or "Lender in good faith believes itself insecure."  However, these events of default defined in the Loan documents, taken separately or together, while they may give rise to civil liability, in this Court's view they fall far short of satisfying MWB's burden to show fraudulent intent to permanently deprive MWB possession as required for larceny as described in *Mirth*, *Silva*, and *Wilson*.

In particular, the Court rejects MWB's contentions that Long's concealment of the lien to Montana Sky and regular monthly payments on the Loan constitute concealment and "business as usual fraud" while he used up the proceeds.  Montana Sky failed to exercise prudent due diligence by not performing a UCC lien search on AboutMontana prior to purchasing its assets, but that does not constitute concealment by Long as MWB contends.  Hart admitted that MWB did not perform a lien search before approving the Loan[29].  As far as MWB's contention that the regular payments on the Loan after the sale while Long spent the proceeds constitute "business as usual fraud," MWB cannot have it both ways.  The note, Ex. 2A, required regular monthly payments and defined default as borrower's "failure to make any payment when due."  The security agreement, Ex. 2B, also defines default as failure to make any payment when due.  The Court sees no concealment or fraudulent intent by Long in his compliance with the terms of the note and security agreement by continuing to make payments when due to avoid default on the Loan.

After the sale Long continued to make the Loan payments while attempting to change the

_____

[29]The FIB equipment note had been disclosed in Section 8.0 of Ex. 1C.

nature of AboutMontana's business.  He admitted that he transferred the proceeds to his personal

account and use, and that he used sale proceeds to pay his personal credit card debts and other

personal debts, but testified that he used his personal credit cards to pay business debts.  Long

testified that he considered his personal matters and AboutMontana's matters the same.  While

mistaken, his personal guaranty of the Loan made him understand he was personally liable for

the corporate Loan debt.

MWB argues that no objective evidence exists in the record supporting Long's contention

that AboutMontana continued in business after the asset sale while he spent the sale proceeds,

and that Long made no mention of the motorcycle magazine and other computer business at the

meeting of creditors or in pretrial testimony.  That argument is contradicted by the record.  MWB

cites *Mickens* as presenting a similar set of facts constituting nondischargeable larceny, but

*Mickens* is clearly distinguishable on the facts.

In *Mickens*, 312 B.R. at 680, the court summarized the Ninth Circuit decision in

*Transamerica Commercial Fin. Corp. (In re Littleton)*, 942 F.2d 551, 556 (9th Cir. 1991) as

follows:

> In that case [*Littleton*], the bankruptcy debtors were found to have "acted with the
> intent to benefit the corporation by securing financing so that the company could
> pay all its debts[,] . . . [which] . . . negates any contention that the debtors intended
> to defraud" the creditor, and they "applied their entire effort and resources to
> make the business survive[,] . . . [which] . . . was their dominant motivation",
> *Littleton*, at 556.

The court in *Mickens* then compared the facts in its record with those in *Littleton*:

> [T]he evidence in this case does not even remotely begin to support that
> description for what these Debtors did and failed to do, whereas it does show that
> their failure to turn over any sale proceeds to Creditor was marked by
> circumstances indicating fraud.  The Debtors knowingly transferred Creditors'

> vehicles to third parties and received proceeds in exchange, which they know they were required to turn over and intentionally did not – unlike the circumstances of *Littleton*, the Debtors' failure to remit any proceeds to Creditor was not part of a good faith effort to save their business in the hopes of being able to pay Creditor later.  Accordingly, such failure constitutes non-dischargeable embezzlement and/or larceny pursuant to § 523(a)(4).

*Mickens*, 312 B.R. at 681.

Three pages earlier in *Mickens* the court explains why the evidence did "not even remotely begin to support" a finding that the debtors made a good faith effort to save their business in the hopes of paying the creditor later.  The court found that the debtors did not appear at trial and did not offer any excuse for their failure to appear, which tended to support an inference that they sought to avoid cross examination under oath.  *Mickens*, 312 B.R. at 678.  While the instant case is similar to *Mickens* in that no criminal charges have been shown to have been brought against the Debtor, Long appeared at trial and testified under extensive cross examination.  The lack of credibility, absence of evidence showing good faith effort to save the business, and inference that the debtor sought to avoid cross examination, all of which were present in *Mickens*, all are absent in the instant case and distinguish it from *Mickens*.

On the issue of credibility, the Court observed Long's demeanor while testifying under oath and cross examination, and has reviewed both the transcript of the § 341 meeting (Ex. 11) and Long's deposition (Ex. 13).  As Samson noted, Long is a nervous witness and prone to confusion.  He confuses and presumes to know more about terms, such as an asset sale versus a stock sale, than he does and he struggles with the concept of separating personal obligations and corporate obligations.  But he readily admits his mistakes and corrected his testimony.  With that in mind, the Court finds that on balance Long is a credible witness.  *Allen v. Iranon*, 283 F.3d

1070, 1078 n.8 (9th Cir. 2002); *Public Finance Corp. v. Taylor (In re Taylor)*, 514 F.2d 1370,

1373-74 (9th Cir. 1975); *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84

L.Ed.2d 518 (1985).

     MWB contends that no objective evidence exists supporting Long's claim that he was

trying to develop a new business after the asset sale, but that contention is not true. Long

testified at trial that after the asset sale, which was prompted when AboutMontana was cut off

from internet access and prevented from developing his business plan described on Ex. 1C, he

tried to continue in business, either through AboutMontana or another company, by developing a

motorcycle magazine and computer data base. He testified that he had investors lined up to

finance the magazine, but that they pulled out and withheld financing when a competitor

magazine appeared. Long had transferred the sale proceeds to his personal account and to

himself, and testified that he continued to use the proceeds to pay business and personal debts

and the Loan payment while trying to develop the new businesses, until he defaulted. Long's

testimony at trial is uncontroverted.

     Long's testimony is also corroborated by MWB's own evidence, Long's deposition, Ex.

13, dated September 19, 2007, where under questioning by MWB's counsel Long discussed

talking to investors and exploring other business opportunities in computers and a magazine

while AboutMontana continued to function as a business after the asset sale. Ex. 13, pp. 11-12,

23, 30, 91. MWB had 4 months after the deposition before trial to investigate Long's assertions

about new business opportunities, but offered no evidence at trial refuting Long's testimony

regarding his efforts to start the magazine and computer database businesses.

     Thus, unlike *Mickens* Long appeared at trial and was subject to cross examination, and

paid some of the sale proceeds to MWB in the form of regular Loan payments.  Long did not

abscond with the proceeds, and his testimony regarding his efforts to develop new businesses for

AboutMontana is more similar to the facts in *Littleton* than *Mickens*.  This Court finds under §

523(a)(4) that Long acted with intent to benefit his corporation so that it could pay its debts,

which negates the contention that he intended to defraud MWB or permanently deprive it of its

Loan repayment.  *See Littleton*, 942 F.2d at 556.  Long failed in AboutMontana's ISP business,

and was not able to develop the new businesses when he lost his financing and defaulted on the

MWB Loan.  Applying the burden of proof to MWB under § 523(a)(4), and after considering the

circumstantial evidence that tends to establish what Long must have actually known when taking

the injury producing action, this Court concludes that MWB failed its burden to show fraudulent

intent to permanently deprive MWB of its property required for larceny.

### D.  Embezzlement.

Embezzlement under § 523(a)(4) exists where a person fraudulently misappropriates

property of another.  *Borough v. Rogstad (In re Rogstad)*, 126 F.3d 1224, 1228 (9th Cir. 1997);

*Littleton*, 942 F.2d at 555.  Embezzlement requires three elements:  "(1) property rightfully in the

possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which

[it] was entrusted; and (3) circumstances indicating fraud."  *Littleton,* 942 F.2d at 555, quoting

*Nat'l Bank of Commerce of Pine Bluff v. Hoffman (In re Hoffman)*, 70 B.R. 155, 162 (Bankr.

W.D. Ark. 1986).

The Ninth Circuit in *Littleton* affirmed the lower courts' holding that the creditor did not

meet its burden of proof on the embezzlement claim when the lower courts found that the debtors

acted with intent to benefit the corporation so that it could pay all its debts, and rejected the

creditor's contention that the debtors embezzled and intended to defraud the creditor when they did not segregate proceeds and did not pay the creditor. *Littleton,* 942 F.2d at 555-56. Likewise in the instant case Long did not segregate the proceeds and pay off the Loan with them, and so misappropriated the proceeds to a use other than to which they were entrusted, but his record of regular Loan payments and his attempt to change AboutMontana's business to the motorcycle travel magazine after his ISP business was blocked by internet access providers demonstrates that Long acted with intent to benefit AboutMontana by keeping it in business so that it could repay MWB, just as in *Littleton*. As discussed above regarding larceny, after considering the circumstantial evidence that tends to establish what Long must have actually known, this Court concludes that MWB failed its burden to show circumstances indicating fraud, which are required to prove embezzlement, by a preponderance of the evidence under § 523(a)(4). *Littleton*, 942 F.2d at 555.

## II. 523(a)(6) – Willful and Malicious.

### A. Contentions.

MWB argues that Long acted deliberately and without just cause or excuse when he took the sale proceeds for his own use rather than pay them to the secured creditors. MWB contends that Long converted the sale proceeds in AboutMontana's checking account, and that conversion is considered to be a willful and malicious act sufficient for exception under § 523(a)(6). MWB again cites *Mickens* for the proposition that the crucial element is whether debtors had actual knowledge that harm to the creditor was substantially certain to occur as a result of their conduct, and that the evidence did not suggest debtors had some kind of good faith plan to raise funds to pay the creditor, but rather their actions constituted willful and malicious damage to the

44

creditor's property which was nondischargeable under § 523(a)(6).  *Mickens,* 312 B.R. at 680.

Long argues that MWB failed to produce evidence of willfulness, maliciousness, injury, and that MWB rather than Long caused the injury when MWB failed to pursue a conversion claim under Montana's UCC.  Long admits that he sold the business assets, but argues that he did so in response to market conditions and with business justifications.  He argues that he did not injure MWB since it retained its security interest and enforced the security interest against the purchaser which resulted in compromise.  Long argues that MWB showed at best a breach of contract in the breach of the security agreement, but cites *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,1205, 1207 (9th Cir. 2001), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001) that § 523(a)(6) generally applies to torts rather than contracts, that an intentional breach of contract will not give rise to a nondischargeable debt, and that § 523(a)(6) does not encompass negligent or reckless acts.  Long distinguishes *Mickens* on the facts, such as that Long appeared at trial and testified, deposited all sale proceeds into the MWB account and made payments on the debt, including the MWB loan and other business expenses, did not create any new shell business, and had a legitimate good faith but ultimately futile plan to set up a new business, which is uncontroverted by any evidence.

### B.  Willful and Malicious.

Section 523(a)(6) excepts from discharge any debt "(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."

*Mickens* has been distinguished above, under the discussion of § 523(a)(4), from the facts of this case.  Under § 523(a)(6) the court in *Mickens* charged the debtors with actual knowledge that harm to the creditor was substantially certain to occur as a result of their conduct in selling

45

the creditor's vehicles without remitting any of the proceeds to the creditor. *Mickens,* 312 B.R. at 680. In the instant case Long continued to make AboutMontana's regular Loan payments from the proceeds to the MWB for several months while he tried to develop new businesses and generate profit to pay the Loan. In doing so Long breached the Loan agreements under various default provisions.

The Ninth Circuit in *Rogstad* cited *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1501 (7th Cir. 1991), that willful breach of contract qualifies under § 523(a)(6). *Rogstad*, 126 F.3d at 1228. *Jercich* explains the relation of § 523(a)(6) to breach of contract:

> [T]here is nothing in the language of § 523(a)(6) to indicate that a debt arising from a breach of contract is excepted from discharge only if the debtor's conduct would be tortious even if no contract existed. To the contrary, although § 523(a)(6) *generally* applies to torts rather than to contracts and an intentional breach of contract *generally* will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6).

*Jercich*, 238 F.3d at 1205 (emphasis in original).

The evidence shows numerous defaults by AboutMontana under the Loan agreements, which constitute intentional breaches of contract, for which Long is civilly liable under his personal guaranty. Under the general rule described in *Jercich*, AboutMontana's intentional breaches of contract will not give rise to nondischargeable debt under § 523(a)(6) unless MWB shows that they were accompanied by tortious conduct which resulted in willful and malicious injury. *Id.*, 238 F.3d at 1205. "It is well settled that a simple breach of contract is not the type of injury addressed in § 523(a)(6)." *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992), quoted in *Jercich*, 238 F.3d at 1205.

An injury is willful under § 523(a)(6) if the debtor intends the consequences of his actions. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *Albarran*, 347 B.R. at 384. The Ninth Circuit wrote in *Su*, 290 F.3d at 1144: "The holding in *In re Jercich* is clear: § 523(a)(6) renders debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially certain." Subjective belief includes actual knowledge that harm is substantially certain to result. *Su*, 290 F.3d at 1145-46; *Albarran*, 347 B.R. at 384.

Subjective intent may be gleaned from objective factors and circumstantial evidence which tends to establish what the debtor must have actually known when taking the injury-producing action. *Su*, 290 F.3d at 1146 n.6; *Albarran*, 347 B.R. at 384; *Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 742 (9th Cir. BAP 2001). Reckless disregard is insufficient to establish willfulness under § 523(a)(6). *Geiger*, 523 U.S. at 61, 118 S.Ct. 974; *Su*, 290 F.3d at 1145-46. The Ninth Circuit wrote in *Su*:

> That the Bankruptcy Code's legislative history makes it clear that Congress did not intend § 523(a)(6)'s willful injury requirement to be applied so as to render nondischargeable any debt incurred by reckless behavior, reinforces application of the subjective standard. The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain.

*Su,* 290 F.3d at 1145-46.

Applying the above standard for willfulness, the Court finds that MWB has failed to satisfy its burden of proof under § 523(a)(6). MWB argues that Long converted the proceeds to his personal account and spent them, without any good faith plan to raise funds to pay the Loan, and so must have believed that MWB's injuries were substantially certain to result from his acts.

47

But the evidence does not support MWB's argument. Long did not abscond with the proceeds, continued to make Loan payments from the proceeds after transferring them to his personal account, and while he spent proceeds on his personal matters he also spent them on business trying to develop his motorcycle travel magazine and computer data base. AboutMontana's ISP business, for which MWB had approved the Loan, failed when it was cut off from access to the internet by third parties, and Long attempted to recover and develop new businesses to repay the Loan from new sources of profit. Long failed, but if he had succeeded in developing the new businesses profitably and kept making the payments the defaults may well never have injured MWB or even come to its attention. MWB succeeded in showing intentional breaches of the Loan agreements, and showed imprudent, unrealistic and perhaps reckless behavior by Long in his unsuccessful business ventures using MWB's collateral, but all that fails to satisfy the willfulness requirement under § 523(a)(6) under *Jercich* and *Su* to show the debtor's actual knowledge that harm to the creditor was substantially certain.

The "malicious" requirement is satisfied when plaintiff shows "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Jercich*, 238 F.3d at 1209. MWB has satisfied the first two elements by the numerous intentional breaches by AboutMontana in default of the Loan agreements. But MWB failed to satisfy the third and fourth elements. As discussed above, if Long had succeeded in the new magazine business and computer database and kept making Loan payments, then the intentional breaches of contract and conversion of proceeds would not necessarily cause MWB injury.

Whether Long's attempt at new business ventures were made with just cause or excuse is a close question, but MWB failed to offer any evidence at trial disproving Long's testimony at

48

his deposition which corroborated his trial testimony. The evidence shows that his new businesses failed when financing did not materialize because a competitor magazine appeared, and so just like AboutMontana's ISP business it failed for reasons outside of Long's control. Long's business failures exposed him to civil liability under the personal guaranty, but the Court concludes that MWB failed to satisfy its burden of proof under § 523(a)(6) by a preponderance of the evidence to show willful and malicious injury by Long to MWB.

### III.  § 727(a)(4)(A) – False Oath.

Certain principles apply to both of MWB's claims for denial of Long's discharge under § 727(a). First, "[a] claim for denial of discharge under § 727 is construed liberally and in favor of the discharge and strictly against a person objecting to the discharge." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)).

Section 727(a)(4)(A) provides for denial of a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account."

### A.  Contentions.

MWB objects to Long's discharge on the grounds he made a false oath at his § 341 meeting when he responded "Yes," without qualification, when the Trustee asked if all of the $130,000 in asset sale proceeds were used to satisfy company debt. MBW contends that the elements of § 727(a)(4)(A) are shown that Long made a false oath or statement, knowingly and fraudulently, which was material to the bankruptcy proceedings. MWB cites the Trustee's testimony that he would have pursued the case differently if Long has answered "No," that the asset sale proceeds were not all used to satisfy company debt. MWB contends this was material

because it bears a relationship to the Debtor's business transactions or estate, concerns the discovery of assets, business dealings or the existence and disposition of his property.

MWB argues that Long's false oath was made knowingly and fraudulently because his § 341 testimony, Ex. 11, was detailed and that his trial testimony that he made a mistake at his § 341 meeting must be rejected when reviewing his § 341 testimony in whole. MWB contends that the numerous corporate checks Long wrote to himself totaling $57,700 and dozens of other checks to third parties for his benefit, show that he had to know he was making a false oath, as did his sophisticated intra-account transfer in late 2005 for the purpose of placing enough funds back into the AboutMontana account so that he was able to make a final secured loan payment to conceal the fact that AboutMontana had shut down while Long was completing his personal use of corporate money.

Long argues that no evidence exists in the record that he made false statements or oaths, that any false statements he may have made were not material, and were not made knowingly or fraudulently.

### B.  False Oath.

This Court set forth long standing case law construing § 727(a)(4)(A) in *Wright*, 364 B.R. at 71-76:

> The Bankruptcy Code provides that a debtor under Chapter 7 shall be granted a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case--(A) made a false oath or account...."  11 U.S.C. § 727(a)(4).  Thus, to succeed on a § 727(a)(4)(A) claim, the objecting party must demonstrate that:  (1) a false oath or statement was made by the debtor; (2) knowingly and fraudulently; (3) which was material to the course of the bankruptcy proceedings.  *First Nat'l Bank of Crosby v. Syrtveit (In re Syrtveit)*, 105 B.R. 596 (Bankr. Mont. 1989).  A false oath or statement is made when it occurs (1) in the debtor's schedules or (2) at an examination during the course of the proceedings.  *Scimeca v. Umanoff*, 169

50

B.R. 536, 542 (D.N.J.1993); *aff'd*, 30 F.3d 1488 (3d Cir.1994).  The Court in
*Scimeca* noted that while the initial burden lies on the objector to prove that the
debtor made a false statement in connection with the proceedings, once it
"reasonably appears the oath is false, the burden falls on the bankrupt" to disprove
the allegation.  *Scimeca*, 169 B.R. at 542; *Kramer v. Poland (In re Poland)*, 222
B.R. 374 (Bankr. M.D.Fla 1998) ("it is well established that once the Plaintiff has
met the initial burden by producing evidence which establishes a basis for the
objection, the Defendant has the ultimate burden of persuasion.  *See, Chalik v.
Morrefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).").

* * * *

With regard to materiality, the Eighth Circuit Court of Appeals adopted the
following standard of materiality as espoused by the Eleventh Circuit Court of
Appeals in *Chalik*, 916 F.2d at 484:

> The subject matter of a false oath is 'material,' and thus sufficient to bar
> discharge, if it bears a relationship to the bankrupt's business
> transactions or estate, or concerns the discovery of assets, business
> dealings, or the existence and disposition of his property.

*Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992). . . .  This case highlights an
obvious and fundamental maxim in bankruptcy–that providing false information
under oath in a bankruptcy proceeding is not a matter to be taken lightly.  *See e.g.,
Tully*, 818 F.2d 106, 112 (1st. Cir. 1987) (stressing that sworn statements in
bankruptcy schedules "must be regarded as serious business" because "the system
will collapse if debtors are not forthcoming"); *In re Nazarian*, 18 B.R. 143, 146
(Bankr. D.Md.1982) (noting that a creditor need not actually rely on the false
statement).  As previously noted by this Court,

> The primary purpose of § 727(a)(4)(A) is to ensure that dependable
> information is supplied to those interested in the administration of the
> bankruptcy estate so they can rely upon it without the need for the
> Trustee or other interested parties to dig out the true facts through
> examinations or investigations.

*Bastrom*, 106 B.R. at 227.

*Torgenrud v. Schmitz,* 224 B.R. 149, 150-51, 17 Mont. B.R. 43, 44-46 (Bankr. D.
Mont. 1998).

All that is required for a denial of discharge under the plain language of § 727(a)(4)(A) is

a single false oath or account. *Wright*, 364 B.R. at 73; *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (1st Cir. BAP 1999) (*citing Schmitz*). Materiality may be established if a false statement "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Abbey v. Retz (In re Retz)*, 364 B.R. 742, 758-59 (Bankr. D. Mont. 2007) (denying summary judgment), quoting *Fogale Legware of Switzerland, Inc. v. Wills*, 243 B.R. 58, 62 (9th Cir. BAP 1999).

Based on Long's ready admission at trial that his answer "Yes" to the Trustee's question whether all of the $130,000 was used to satisfy company debt, the Court finds that Long made a false oath or statement at the § 341 meeting that was material because it bore a relationship to his business transactions or the existence and disposition of the debtor's property. However, MWB still has the burden of showing that Long made the false oath knowingly and fraudulently. *Wright*, 364 B.R. at 74-75.

First, the requisite fraudulent intent "must be actual, not constructive." *Wright,* 364 B.R. at 75; *Wills* 243 B.R. at 64 (citing *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753 (9th Cir. 1985)). MWB may prove such intent through "circumstantial evidence or by inferences drawn from Long's course of conduct." *Id*. (citing *Devers*, 759 F.2d at 753-54). Surrounding circumstances and certain badges of fraud may establish the necessary intent. *Wills*, 243 B.R. at 64 (citing *Emmett Valley Associates v. Woodfield (In re Woodfield),* 978 F.2d 516, 518-19 (9th Cir.1992)). Although *Woodfield* involves 11 U.S.C. § 727(a)(2), the analysis of intent applicable to such section applies also to 11 U.S.C. § 727(a)(4). 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.). "A court may find the requisite intent where there has been a pattern

of falsity or from a debtor's reckless indifference to or disregard of the truth." *Wills*, 243 B.R. at

64 (citing *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr. S.D.Cal. 1996)).

The second term "knowingly" requires Long to act deliberately and consciously. *Wright*,

364 B.R. at 75; *Roberts*, 331 B.R. at 883. The following analysis from *Roberts*, is instructive:

> The bankruptcy court did not make a finding that Roberts acted deliberately and consciously in failing to make these disclosures until he amended his Statement. Instead, the court found that Roberts exhibited, "a careless and reckless approach to the important duty of disclosure in sworn bankruptcy filings." "Careless and reckless" is a lower standard than "knowing."
>
> An action is careless if it is "engaged in without reasonable care." *Id.* at 225. This is a negligence standard, not a knowing misconduct standard. A false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent." *See, e.g., Mondore v. Mondore (In re Mondore),* 326 B.R. 214, 217 (Bankr.W.D.N.Y.2005) ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent").
>
> Similarly, recklessness does not measure up to the statutory requirement of "knowing" misconduct. An action is reckless if it creates, "a substantial and unjustifiable risk of harm to others [through] a conscious (and sometimes deliberate) disregard for or indifference to that risk . . . ." BLACK'S LAW DICTIONARY at 1298. Since the bankruptcy court did not find that Roberts made his nondisclosures "knowingly" in the required sense, we cannot sustain the denial of his discharge.

*Roberts*, 331 B.R. at 884. The Court notes however that "[a] reckless disregard of both the

serious nature of the information sought and the necessary attention to detail and accuracy in

answering may rise to the level of fraudulent intent necessary to bar a discharge." *Wright*, 364

B.R. at 76, quoting 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.). The elements of

"knowingly" and "fraudulently" may not be conflated. They each must be proven. *See Roberts,*

331 B.R. at 885. Under the liberal construction of §727 in favor of discharge and strictly against

MWB's objection to discharge, the Court finds that MWB failed its burden to show Long made

the false oath knowingly and fraudulently.

MWB urges the Court to consider the entire § 341 transcript, Ex. 11, which the Court has done. Long admitted his answer was incorrect, but testified that he was nervous. The Trustee testified that is common at creditors' meetings, and noted in particular that Long was confused regarding the meaning of terms such as asset sale and stock sale, and that he answered the Trustee's question without understanding the difference. At most, Long's one word answer regarding the disposition of sale proceeds reflects his nervousness, confusion, and perhaps a careless and reckless approach to the Trustee's question, none of which in this Court's view add up to Long "deliberately and consciously" falsely testifying with actual fraudulent intent, which are required under *Wright, Wills,* and *Roberts. See Wright,* 364 B.R. at 75, 76. As stated earlier, the Court deems it significant that the Trustee did not join in or support denial of Long's discharge based upon a false oath.

Under § 727(a)(4)(A), the Court finds that MWB failed to satisfy its burden of proof by a preponderance of the evidence of showing a knowing and fraudulent false oath and omission by Long at his § 341 meeting. *See Wright,* 364 B.R. at 72-73, quoting *Schmitz,* 224 B.R. at 150-51 and *Wolcott,* 194 B.R. at 486 (citing cases). MWB failed to show that the single false oath by Long in answering "Yes" at the § 341 meeting, without further explanation, was made knowingly and with fraudulent intent, or with reckless indifference to and disregard of the truth. *Wright,* 364 B.R. at 75-76.

**IV.  § 727(a)(3)(A).**

Section 727(a)(3) provides that the court shall grant the debtor a discharge, unless – "(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any

54

recorded information, including books, documents, and papers, from which the debtor's financial condition of business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."  MWB has the burden of proof under § 727(a)(3) which is strictly construed against the party objecting to discharge.  *Wright*, 364 B.R. at 68.

The Ninth Circuit explained in *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994):

> "[t]he purpose of [section 727] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Cox*, 904 F.2d at 1401 (internal quotations and citations omitted). The initial burden of proof under § 727(a)(3) is on the plaintiff. Fed.R.Bank.P. 4005. "In order to state a prima facie case under section 727(a)(3), a creditor objecting to discharge must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir.1992). Once the objecting party shows that the debtor's records are absent or are inadequate, the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records. *Id.* at 1233; *Cox*, 904 F.2d at 1404 n. 5; *Matter of Horton*, 621 F.2d 968, 972 (9th Cir.1980); *In re Lawler*, 141 B.R. 425, 428-29 (9th Cir. BAP 1992) (stating that a debtor must "provide a credible explanation" for failure to keep records); see also *In re Wolfson*, 152 B.R. 830, 832 (S.D.N.Y.1993); *In re Folger*, 149 B.R. 183, 188 (D.Kan.1992); *In re Pulos*, 168 B.R. 682, 690 (Bankr.D.Minn.1994); *In re Sausser*, 159 B.R. 352, 355-56 (Bankr.M.D.Fla.1993).

*Cox*, 41 F.3d at 1296-97; *Wright*, 364 B.R. at 68.  Intent to conceal is not a necessary element for the denial of discharge under § 727(a)(3).  *Cox*, 41 F.3d at 1297.

### A. Contentions.

MWB argues that Long concealed records necessary to determine the business transactions at issue.  MWB argues that Long resisted discovery and did not produce Wells Fargo records of his personal checking account, which it argues was necessary to show $35,000 in

deposits from AboutMontana's checking account into his personal account and the intra-account transfer of funds back into the corporate checking account to facilitate the final secured loan payment made by AboutMontana. MWB argues that Long also concealed and failed to produce his credit card records for the months following the June 2005 asset sale, and as such is not entitled to discharge under § 727(a)(3).

Long argues that he produced requested records, and that even if he did not produce them his failure did not make it impossible for MWB to ascertain his financial condition and material business transactions. Long contends that he produced records which he had in his possession or control in a manner reasonable under the circumstances, that MWB failed to conduct discovery or document requests to form the basis for its § 727(a)(3) claim, that MWB failed to describe with any specificity which records he failed to produce, and that MWB has possession of records it alleges he failed to produce or preserve.

### B. Failure to Maintain and Preserve Adequate Records.

In reviewing the record in this case the Court notes that it includes dozens of exhibits including bank records with copies of checks covering several months and several accounts, credit card statements, loan histories, UCC filings, Loan documents, pleadings, and correspondence between the parties' counsel.

The docket in this adversary proceeding reflects that MWB served discovery requests on Long, and that the discovery deadline was extended to enable MWB to conduct third party discovery. MWB did not file a motion to compel production of any documents by Long before trial, and no order to compel production was ever entered. MWB argues that additional documents were necessary to show the $35,000 deposit and intra-account transfer of funds, but it

56

was able to show the deposit and transfer of funds at trial, which undercuts its argument that somehow Long concealed the documents necessary to show what it showed.

In *Wright* the Court discussed the case *Matter of Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996), in which the creditor offered the testimony of two expert accountants who testified, after reviewing the debtor's records, and concluded that the debtor's records were incomplete compared with what similar clients kept. *Wright*, 364 B.R. at 51. MWB did not offer any qualified expert accountant or other witness regarding what it found in Long's records, and offered no expert testimony by qualified experts upon which the Court could make a finding that Long's records were not adequate or specifying what documents and records would be considered adequate. Hart testified at length about AboutMontana's MWB Loan documents and account statements. Given MWB's burden of proof and strict construction of § 727(a) against the objecting party, *Roberts*, 331 B.R. at 882, any inference by the Court regarding the adequacy of Long's books and records, in the absence of qualified testimony, would be inappropriate and inconsistent with the assigned burden of proof. *Wright*, 364 B.R. at 69.

Samson did not join in MWB's § 727(a)(3) objection to discharge, and testified instead that no additional documents were needed beyond that which Long produced in preparation for the meeting. Based on the records produced at trial, absence of any motion to compel discovery, and MWB's failure to offer testimony by an expert as offered in *Juzwiak*, the Court concludes that MWB failed to satisfy the first *Cox* requirement that the Debtor failed to maintain and preserve adequate business records. Given that failure it is not necessary to consider the second *Cox* factor – whether it is impossible to ascertain the Debtor's financial condition and material business transactions, and the burden of proof does not shift to Long. *Wright*, 364 B.R. at 70;

*Cox*, 41 F.3d at 1296.

### V.  Attorney's Fees.

Long's counterclaim seeks attorney's fees and costs based on contract and statute, MCA §

28-3-704 which provides:

> **Contractual right to attorney fees treated as reciprocal**.  Whenever, by virtue
> of the provisions of any contract or obligation in the nature of a contract made and
> entered into at any time after July 1, 1971, one party to such contract or obligation
> has an express right to recover attorney fees from any other party to the contract or
> obligation in the event the party having that right shall bring an action upon the
> contract or obligation, then in any action on such contract or obligation all parties
> to the contract or obligation shall be deemed to have the same right to recover
> attorney fees and the prevailing party in any such action, whether by virtue of the
> express contractual right or by virtue of this section, shall be entitled to recover
> his reasonable attorney fees from the losing party or parties.

MWB argues that Long is not entitled to attorney's fees and costs because the terms of

the Loan contract are not before the Court, and MWB has prevailed in its foreclosure and

obtained a judgment against AboutMontana.  MWB contends that the debt and loan contract are

not at issue in this matter, that the dischargeability issue does not depend on any contract issue

and therefore Long is not entitled to attorney's fees as prevailing party.  On this final issue the

Court agrees with MWB.

The American Rule denies attorney's fees in the absence of contract, applicable statute, or

other exceptional circumstances, and any exceptions to the American Rule are narrowly

circumscribed.  *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,*  __

U.S. __, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *Bertola v. Northern Wisc. Prod. Co., Inc. (In*

*re Bertola)*, 317 B. R. 95, 99-101 (9th Cir. BAP 2004); *Acequia, Inc. v. Clinton (In re Acequia,*

*Inc.)*, 34 F.3d 800, 819 (9th Cir. 1994) (quoting *Richardson v. Alaska Airlines, Inc.*,750 F.2d 763,

58

765 (9th Cir. 1984)).  The default rule can be overcome by statute or an enforceable contract.

*Travelers,* __ U.S. __, 127 S.Ct. at 1203.  In *Bertola*, the Bankruptcy Appellate Panel provided

the following analysis:

> The instant litigation involves nondischargeability causes of action that are
> predicated on state law fraud and conversion actions.  Even accepting the
> existence of the implied bailment contract, it is clear that this contract was not a
> substantive predicate to the fraud and conversion actions.  Rather these actions are
> akin to the misrepresentation actions in [*Sparks v. Republic Nat'l Live Ins.,* 132
> Ariz. 529, 543, 647 P.2d 1127, 1141 (1982)].  In short, the nondischargeability
> claims could have been brought independently of the existence of the contract.
> The contract between Northern Wisconsin and The Cheese Company was merely
> a factual predicate to the nondischargeability claim.  Thus, an award of attorneys'
> fees appear facially improper.

*Bertola*, 317 B.R. at 101.  "[W]hether fees may be awarded in bankruptcy proceedings generally

depends, in part, on whether the case involves state or federal claims and whether the applicable

law allows such fees."  *Bertola*, 317 B.R. at 99.

The rule in Montana was stated by the Montana Supreme Court in *Harding v. Savoy*,

2004 MT 280, ¶ 68-69, 323 Mont. 261, 277-78, ¶ 68-69, 100 P.3d 976, 986-87, ¶ 68-69 as

follows:

> The longstanding rule in Montana, also known as the American Rule, is absent a
> contractual or statutory provision to the contrary, attorney fees will not be
> awarded to the prevailing party in a lawsuit.  *Pankratz Farms, Inc. v. Pankratz*,
> 2004 MT 180, ¶ 93, 322 Mont. 133, ¶ 93, 95 P.3d 671, ¶ 93 (citing *Erker v.
> Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, ¶ 43, 988 P.2d 1221, ¶ 43).  In the
> present case, neither a statutory nor contractual basis for an award of attorney fees
> exists; however, in rare instances a district court may award attorney fees to an
> injured party under its equity powers.  *Pankratz*, ¶ 93 (citing [*Foy v. Anderson*
> (1978), 176 Mont. 507, 511-12, 580 P.2d 114, 116-17.]

The Montana Supreme Court in *Garrison v. Averill* (1997), 282 Mont. 508, 521, 938 P.2d

702, 710, has held

> Garrison did not sue Gained for default or breach of any term of the agreement; nor did he sue Gained for specific performance of the agreement following such a default. Garrison sued Gained for rescission of the buy-sell agreement based on fraud and failure of consideration. . . .  [I]n is clear that the attorney fee provision in paragraph 5 and 6 of the buy-sell agreement do not apply to Garrison's action against Gained and, as a result, they cannot support a "reciprocal right to attorney fees in Gained pursuant to  § 28-3-704, MCA.

This holding affirms the necessity of pursuing an action on the contract or raising a defense based on the contract and then prevailing on such action or defense.

In the Ninth Circuit, courts have consistently refused to award fees when the substantive legal question was governed by federal bankruptcy law rather than basic contract enforcement questions, even when the underlying agreement contains an attorney fee provision enforceable under state law. *Deroche v. Ariz. Indust. Comm. (In re Deroche)*, 434 F.3d 1188, 1191 (9th Cir. 2006); *Fobian v. Western Farm Credit Bank*, 951 F.2d 1149, 1153 (9th Cir. 1991). The *Deroche* and *Fobian* rules were rejected by the United States Supreme Court in *Travelers,*  __ U.S. __, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).

Statutory provisions in the Bankruptcy Code exist for dischargeability proceedings, but not for any of the claims for relief brought by MWB in the instant case. Fees and costs to a prevailing debtor are provided for in § 523(a)(2)(A) proceedings pursuant to 11 U.S.C. § 523(d) which provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

"The purpose of § 523(d) is to deter creditors from bringing frivolous challenges to the discharge

60

of consumer debts.  See S.Rep. No. 98-65, at 9-10 (1983)."  *First Card v. Hunt (In re Hunt)*, 238

F.3d 1098, 1103-04 (9th Cir. 2001); *Sparks v. King (In re King)*, 258 B.R. 786, 797-98 (Bankr. D.

Mont. 2001).  However, the Supreme Court in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212

(1998), decided that a debt in a proceeding under § 523(a)(2)(A) could include attorneys' fees if a

prevailing party was entitled to attorneys' fees under nonbankruptcy law.  In *Cohen*, the New

Jersey Consumer Fraud Act allowed damages, treble damages attorneys' fees and costs.  "Given

that *Cohen* read § 523(a)(2) in *pari materia* with (a)(6) and that the same logic that was applied

to (a)(2) also applies to (a)(6), [the Bankruptcy Appellate Panel found] it persuasive that whether

the successful plaintiff could recover attorneys' fees in a non-dischargeability court is likewise

the determinative question under § 523(a)(6)."  *Bartola*, 317 B.R. at 100.

　　　　MWB's claims for relief are not based on a § 523(a)(2) claim, but instead on §§

523(a)(4), 523(a)(6), and 727(a), to which § 523(d) does not apply.  No Montana state statute

specifically allows attorneys' fees for the nature of the defense raised by Long, and as noted,

MWB did not request fees.  If Congress intended for attorney fees to be available to the debtor

successfully defending claims brought under §§ 523(a)(4), 523(a)(6), or 727(a), it could have

enacted a provision a similar provision to § 523(d).  The absence of such a provision suggests

that an award of attorney fees to prevailing debtors under §§ 523(a)(4), 523(a)(6), and 727(a), is

not appropriate.  "[W]here Congress has intended to provide . . . exceptions to provisions of the

Bankruptcy Code, it has done so clearly and expressly."  *Travelers*, 127 S.Ct. at 1206, quoting

*FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293, 302, 123 S.Ct. 832 (2003).

　　　　Long did not list MWB's claim on his Schedule F as disputed, unliquidated or contingent,

so unlike in *Travelers* in the instant case, as a no-asset case, no claims bar date was set and the

Debtor has not objected to the allowance of MWB's claim.  *Travelers*, 127 S.Ct. at 1204.  The

Supreme Court wrote in *Travelers*:  "[W]e generally presume that claims enforceable under

applicable state law will be allowed in bankruptcy unless they are expressly disallowed."  127

S.Ct. at 1206.  MWB's claim as listed in Long's Schedule F as undisputed, liquidated and

noncontingent is therefore allowed.

Despite Long's success in defending against MWB's objections to discharge and claims

to except its debt from his discharge, a discharge in bankruptcy extinguishes only the personal

liability of the debtor for prepetition debts.  *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111

S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991); *Boeing North American, Inc., v. Ybarra (In re Ybarra)*,

424 F.3d 1018, 1022 (9th Cir. 2005), *cert. denied*, 547 U.S. 1163, 126 S.Ct. 2328, 164 L.Ed.2d

840 (2006); *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525, 531 (9th Cir. 1998).  A

creditor's right to foreclose on a security agreement survives or passes through the bankruptcy.

*Johnson v. Home State Bank*, 501 U.S. at 83, 111 S.Ct. at 2153; *Siegel*, 143 F.3d at 531.

In the Ninth Circuit, "a discharge in bankruptcy does not end a party's obligation, but

merely prevents one method of collection."  *Siegel*, 143 F.3d at 531; *Cortez v. American Wheel,*

*Inc.*, 191 B.R. 174, 178 (9th Cir. BAP 1995).  Applying that Ninth Circuit law, Long did not list

MWB's claim as disputed, unliquidated, or contingent, and his "course of performance"

argument failed to satisfy the requirements of Montana contract law or UCC as a defense of

modification of his agreements with MWB.

Long has prevailed under the bankruptcy statutes at issue, §§ 523(a)(4), 523(a)(6),

727(a)(3) and 727(a)(4)(A), but in no sense can that be construed as Long being the prevailing

party under state law governing the note, security agreement and personal guaranty with MWB.

Indeed, Long's "course of performance" counterclaim upon which he bases his claim for attorney fees and costs is contradicted by his sworn statement in his Schedules that Schedule F was true and accurate in not marking MWB's claim as disputed, unliquidated or contingent.  Under the only contested issue raised in this adversary proceeding based on the Loan agreement, MWB, not Long, is the prevailing party and it has not requested an award of attorneys fees and costs in its prayer for relief or in the approved final pretrial order.

The attorney fee provisions in the security agreement and personal guaranty, Ex. 2B and 2C, include attorney fees in bankruptcy proceedings such as in relation to efforts to modify the automatic stay.  This adversary proceeding is brought in relation to Long's bankruptcy case, but as a separate adversary proceeding.  MWB did not seek an award of attorney fees in the relief sought stated in the Pretrial Order.  In the Pretrial Order Long admitted in the Agreed Facts that under the Loan, security agreement and personal guaranty, AboutMontana defaulted on payments and "Long now owes on the Loan through his personal guarantee of the Loan."

With no part of the Loan documents at issue, and Long's "course of performance" argument having failed to satisfy the requirements for Montana law, the Court concludes, while acknowledging *Travelers*' abrogation of the *Fobian* rule, that Long's counterclaim for attorney fees based on the provisions of the Loan agreements fails to satisfy Montana law where the allowance of MWB's claim and enforcement of the contract is not at issue[30].  Long simply is not the prevailing party under the note, security agreement, personal guaranty and Montana law.

---

[30]The result would have been different had Long not admitted MWB's claim, making the allowance of its claim a contested issue, or if MWB had included in its claims for relief a claim for attorney fees and costs based on the attorney fee provision of the Loan agreement.  In this case the action was not based on a contract dispute.  *See Westlake v. Osborne*, 230 Mont. 364, 750 P.2d 444 (1988) (contract in dispute).

Montana's American Rule applies and bars an award of attorney fees and costs to Long.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this cause under 28 U.S.C. § 1334.

2.  This is a core proceeding involving MWB's objections to discharge and claims for the exception from discharge a debt under 28 U.S.C. § 157(b)(2)(I) and (J) and 11 U.S.C. §§ 523(a)(4), 523(a)(6), 11 U.S.C. §§ 727(a)(3) and 727(a)(4)(A), which are construed liberally and in favor of the Debtor's discharge and fresh start and against the objecting party.

3.  The Plaintiff failed to satisfy its burden of proof by a preponderance of the evidence with respect to its claim for exception of its claim from Defendant's discharge under § 523(a)(4) for larceny and embezzlement.

4.  The Plaintiff failed to satisfy its burden of proof by a preponderance of the evidence with respect to its claim for exception of its claim from Defendant's discharge under § 523(a)(6) for willful and malicious injury to MWB or its property.

5.  The Plaintiff failed to satisfy its burden of proof by a preponderance of the evidence with respect to its claim for denial of Defendant's discharge under § 727(a)(3) for failure to keep or preserve recorded information.

6.  The Plaintiff failed to satisfy its burden of proof by a preponderance of the evidence with respect to its claim for denial of Defendant's discharge under § 727(a)(4)(A) for knowingly and fraudulently making a false oath at the 11 U.S.C. § 341(a) meeting of creditors.

7.  The Defendant failed to satisfy his burden of proof under Montana law, MCA §§ 30-1-205 and 28-2-1602, to show a course of performance which could alter his written Loan agreement with the Plaintiff MWB.

8.  The Defendant failed to establish a right to attorney fees and costs under Montana's "American Rule" based on statute or written agreement because the Defendant is not a prevailing party under the Loan agreement.  Each side is responsible for its own attorney's fees and costs.

**IT IS ORDERED** a separate Judgment shall be entered in conformity with the above dismissing all of Plaintiff's claims for relief and Defendant's counterclaim and this adversary proceeding.  Each party shall be responsible for its own attorney's fees and costs.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana